754 A.2d 1115

**INTERNATIONAL MOTORS INC., t/a General Accident Insurance Co., Montrose Towing Service**

v.

**FORD MOTOR COMPANY, INC.**

No. 1609, Sept. Term, 1999.

Court of Special Appeals of Maryland.

July 5, 2000.

Reconsideration Denied Aug. 31, 2000.

Anthony D. Dwyer (Law Office of Michael DeGeorge on the brief), Rockville, for appellant.

Christian L. Gaarder (John A. McCauley and Venable, Baetjer and Howard, LLP on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SONNER and ADKINS, JJ.

MURPHY, Chief Judge.

This appeal involves judgments entered by the Circuit Court for Montgomery County at the conclusion of a bench trial during which General Accident Insurance Company ("General"), appellant, asserted subrogation claims against Ford Motor Company ("Ford"), appellee, as a result of fire damage to a chassis cab truck[1] manufactured by Ford and insured by General.

---

1. A chassis cab truck consists of a cab and a drive train, and is designed to be modified for use in a number of different applications.

## Factual Background

On March 15, 1995, Ford sold a 1995 F–350 chassis cab truck (the truck) to Homer Skelton Ford, Inc., a Ford dealership in Olive Branch, Mississippi. The truck came with an express "bumper to bumper" warranty that, in pertinent part, provided:

> Authorized Ford Motor Company dealers will repair, replace or adjust all parts on your vehicle (except tires) that are defective in factory-supplied materials on workmanship for 3 years or 36,000 miles (whichever occurs first).

This express warranty, however, was limited by its terms: It stated that Ford would not be responsible for damage caused by "alteration, misuse, or damage caused by accident," or for any consequential damages.[2]

On May 16, 1995, Elzenheimer Chevrolet, located in New York, purchased the truck from Homer Skelton Ford and converted it into a tow truck. To do so, Elzenheimer added many parts including a towing apparatus and strobe lights. On August 4, 1995, International Motors t/a Montrose Towing ("Montrose") purchased the truck from Elzenheimer, and insured it with General. On August 19, 1997, the truck caught fire while its operator was preparing to tow another vehicle.[3] After determining that the truck was a total loss and paying Montrose for its value, General sued Ford for 1) breach of express warranty, 2) breach of implied warranties of fitness and merchantability, 3) negligence and 4) "design defect" strict liability.

---

2. Md.Code Ann., Commercial Law, § 2–313, which, in pertinent part, provides:
 (1) Express warranties by the seller are created as follows:
 (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise....

3. At the time of the fire, the truck had been driven approximately 27,600 miles.

## Procedural History

At the close of General's case, the circuit court granted Ford's motion for judgment with respect to the express warranty and strict liability claims.[4] At the close of all of the evidence, the circuit court found in favor of Ford on the remaining claims, stating that (1) it was persuaded that the fire originated under the hood of the truck, but (2) it was not persuaded by a preponderance of the evidence that the fire was caused by a defect in the truck. General's post-trial motions were denied and this appeal followed, in which General presents the following questions for our review:

I. Was the trial court clearly erroneous when it granted judgment in favor of Ford on the grounds that the express warranty did not apply as a matter of law?

II. Was the trial court clearly erroneous when it found in favor of General on the implied warranty claims?

III. Whether the trial court abused its discretion in granting defendant's motion for protective order where plaintiff had voluntarily made its vehicle available for inspection and where Ford's expert admitted at trial that he used undisclosed photographs?

For the reasons that follow, we shall vacate the judgments entered on appellant's implied warranty claims, and remand for reconsideration of those claims in proceedings not inconsistent with this opinion.

## I.

## Express Warranty Claim

As to the express warranty claim, in which General sought the stipulated value of $23,880.21 (the value of the truck as modified), the circuit court concluded that (1) General's request for money damages was outside the scope of relief

---

4. As to the strict liability claim, the circuit court stated that General failed to produce evidence that there existed a more appropriate alternative design.

permitted by the express warranty,[5] which did not provide for payment of cash; and (2) General failed to prove that the fire was caused by a design defect in the truck. We agree with the circuit court's resolution of the express warranty claim.

 The express "bumper to bumper" warranty was a valid agreement entered into by sophisticated parties who knew and understood its contents. Both the buyer and the seller of the truck were "merchants" under the Commercial Code. Thus, both parties are charged with knowledge of the provisions of the contract, and equal bargaining power to arrive at mutually agreeable terms.[6] An express warranty is breached when "a product fails to exhibit the properties, characteristics, or qualities specifically attributed to it by its warrantor, and therefore fails to conform to the warrantor's representations." *McCarty v. E.J. Korvette, Inc.*, 28 Md.App. 421, 437, 347 A.2d 253 (1975) (internal citations omitted). The test of defectiveness in a breach of express warranty action is "whether the product performs in accordance with the express warranty given." *Id.* The terms of the express warranty required that General prove a defect in the materials and/or workmanship upon leaving Ford's control. *See McCarty, supra* at 437, 347 A.2d 253 (where the court held that "had the tire here involved been warranted only against defects in material and workmanship, the consumers, in order to establish a breach of warranty, would have had to show that the blowout was caused by such a defect existing at the time the tire left the warrantor's control.").

The express warranty at issue in this case only protects against "parts . . . that are defective in factory-supplied mate-

---

5. The express warranty did not obligate Ford to pay the value of whatever post-sale modifications were made to the chassis cab.

6. "Merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practice or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Md.Code Ann., Commercial Law, § 2-104(1).

rials and workmanship." Thus, in order for General to succeed on a breach of the express warranty claim, General had to prove that a particular part in the chassis cab was "defective." The circuit court found that General was unable to prove that the fire was caused by a defective part. Because the circuit court was not clearly erroneous in concluding that General was unable to prove a defect, we affirm the judgment entered in favor of Ford on General's negligence, strict liability, and express warranty claims.[7]

## II.

### Implied Warranty Claims

■ Ford presented expert testimony that "the fire which resulted in the damage to the 1995 Ford truck on or about August 19th, 1997, was the result of an electrical malfunction within the heating and air-conditioning plenum at the right rear corner of the engine compartment." The circuit court rejected that testimony, finding instead that "this fire did originate under the hood area," rather than in the "cab area." On the basis of that not clearly erroneous factual finding, we

---

7. There is no merit in Ford's argument that the express warranty was not applicable because the fire was a result of an accident. The express warranty stated that Ford will not be liable for damages caused by "alteration, misuse, or damage caused by accident." Ford relies on *Jensen v. American Motors Corporation*, 50 Md.App. 226, 232, 437 A.2d 242 (1981), in arguing that "proof of a defect must arise above surmise, conjecture and speculation, and one's right to recovery may not rest on any presumption from the happening of an accident." The facts of *Jensen*, however, are distinguishable from the facts of the instant case. In that case, a teenage boy flipped a jeep while driving. It was reasonable for the trial court to determine that the jeep flipped because of human error, or "accidental" driving, rather than a manufacturing or design defect.

The facts of this case are quite different. There is nothing in the record to suggest that this fire was caused by an "accident." Rather, a fire started in the engine compartment under the hood at a time when the truck was idling with the engine running. Meanwhile (1)the hood was closed, (2)nobody was under the truck, (3)nobody was sitting inside the passenger compartment,(4)nobody was close enough to where the fire started to have caused it "accidentally," and (5)there was no evidence in the record to suggest that something on the ground under the truck could have caused the fire.

are persuaded that the circuit court should not have entered judgments in favor of Ford on the implied warranties of fitness and merchantability claims. The circuit court did so on the ground that General did not prove "by a preponderance of the evidence that it was either a defect or negligence by the—by the defendant." It is not necessary, however, to prove a particular (manufacturing or design) defect to prevail on an implied warranty claim.

The warranty of merchantability imposes upon sellers the obligation to warrant that the goods are "merchantable," i.e., "fit for the ordinary purposes for which such goods are used." Md.Code Ann., Commercial Law § 2–314(2)(c).[8] The words "defect" or "defective condition" do not appear anywhere in this section of the code, and Maryland case law does not require such proof.

■ General was also provided protection under the implied warranty of fitness for a particular purpose, defined as follows in Md.Code Ann., Commercial Law, § 2–315:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified...an implied warranty that the goods shall be fit for such purpose.

The words "defect" or "defective conditions" do not appear in this section of the code, and Maryland case law does not require such proof. Ford manufactures chassis cabs with knowledge that they will be modified in some form or another. Ford was aware that Elzenheimer had, in the past, purchased Ford chassis cabs for the purpose of turning them into tow trucks. Thus, Ford impliedly warranted that the truck would be fit for usage as a tow truck.

---

**8.** Applied to vehicles, this warranty requires that the vehicle be reasonably safe when used in its normal manner. *Mercedes–Benz of N. Am., Inc. v. Garten,* 94 Md.App. 547, 562, 618 A.2d 233 (1993).

■ Here, the evidence showed that Ford breached its implied warranty of fitness for a particular purpose when (1)General's insured was using the truck as a tow truck, and (2) the truck unexpectedly caught on fire. The circuit court was persuaded that the fire started in the engine compartment of the truck while the truck was idling. The truck was being used "normally" at that time, and trucks do not normally catch on fire while idling.

Implied warranties exist so consumers can recover in cases like this one without having to prove the particular defect that caused the problem. The circuit court was entitled to reject Ford's explanation of how the accident occurred. It was not, however, entitled to impose upon General the burden of proving the particular manufacture or design defect that caused the fire.

■ Ford alleges that it is relieved from liability because the fire was caused by modifications made to the truck after leaving its hands. While a post-sale modification may constitute a valid defense to a warranty claim, Ford—not General—has the burden of persuasion on this issue. Ford did present evidence of post-sale modifications and alterations to the truck.[9] The record, however, does not indicate that the circuit court resolved the issue of whether the fire was caused by alterations or modifications after Ford had sold the truck. It is therefore necessary for the circuit court to determine whether the fire was caused by post-sale modifications to the truck. ·

■ On remand the circuit court must decide whether Ford has an alteration or modification defense specific to the area where the fire originated; i.e. "under the hood area." Any other modifications or alterations are not relevant. This determination must be made on the evidence already present-

---

9. The evidence was sufficient to support a finding. The record also contains ample evidence that Elzenheimer did not modify the blower plenum assembly, and that Montrose did not make any inappropriate alterations to the truck's wiring.

ed to the circuit court. Neither party is entitled to a second "bite at the apple" on this issue.[10] Unless persuaded that the fire started because of alterations to the truck after it left Ford's control, the circuit court shall enter judgment in favor of General on the implied warranty claims.

### III.

### The Protective Order

After the accident, while the truck was in General's possession, Ford hired an expert to examine it. When General sought to depose the expert, Ford objected on the ground that he had been hired "in anticipation of litigation," and was not going to testify as an expert witness at trial. Ford's Motion for Protective Order was granted.

General argues that Ford's expert was not actually hired "in anticipation of litigation," and that even if he was, there is a "substantial need" to discover his findings. There is no merit in these arguments. Md. Rule 2–402(e)(2) restricts discovery of "the identity, findings and opinions" of experts that are not expected to testify. This rule required that General comply with the requirements of Md.Rule 2–402(c), and prove (1) that the information sought was discoverable under Rule 2–402(a), and (2) "that the party seeking discovery has *substantial need for the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means*." (Emphasis added). Even then, General would not be entitled to "disclosure of the mental impressions, conclusions, opinions, or legal theories ... concerning the litigation."

The trial judge's decision on whether to grant a protective order is "vested with a reasonable, sound discretion" and will not be disturbed on appeal without a showing of an abuse of that discretion. *Baltimore Transit Co. v. Mezzanotti,* 227 Md. 8, 13–14, 174 A.2d 768 (1961). We agree with the circuit court

---

**10.** The circuit court may, of course, require additional written and/or oral argument of counsel.

that General could not prove a substantial need to depose the expert who would not be called at trial. The truck was at all times in General's possession and control. The expert investigated that vehicle while in appellant's possession. Thus, General's experts are in actual possession of more than the "substantial equivalent" of the materials considered by Ford's expert. The circuit court did not abuse its discretion in granting the protective order.[11]

**JUDGMENTS AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR RESOLUTION OF IMPLIED WARRANTY CLAIMS IN PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; EACH PARTY TO PAY 50% OF THE COSTS.**

---

11. Even though neither Ford's expert nor any other witnesses will be testifying on remand, this issue is not moot because the protective order denied General's request for discovery of information that might have turned up evidence it could have presented during the trial that has resulted in this appeal.