779 A.2d 362

**FORD MOTOR COMPANY**

v.

**GENERAL ACCIDENT INSURANCE COMPANY,**
t/o/u and t/u/o Montrose Towing Service a/k/a
International Motors, Inc.

**No. 100, Sept. Term, 2000.**

Court of Appeals of Maryland.

Sept. 10, 2001.

John A. McCauley (Marina M. Sabett, Christina L. Gaarder, of Venable, Baetjer and Howard, LLP, on brief), Baltimore, for Petitioner.

Anthony D. Dwyer (Law Offices of Anthony D. Dwyer, on brief), Rockville, for Respondent.

Hugh F. Young, Jr., Products Liability Advisory Council, Inc., Joel Dewey, Jeffrey M. Yeatman, Anthony M. Conti, Piper, Marbury, Rudnick & Wolfe LLP, on brief of Amicus Curiae for Appellant.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

On 5 August 1995, International Motors, Inc., trading as Montrose Towing (Montrose or Respondent), purchased a tow truck from Elzenheimer Chevrolet. The tow truck had been

created by Elzenheimer by adding necessary components to a 1995 Ford F–350 base chassis cab truck that Elzenheimer had purchased from a Ford dealership. Respondent insured the truck with General Accident Insurance Company (General Accident). On 19 August 1997, the tow truck caught fire as its operator was about to tow a vehicle. As a result of the fire, General Accident determined that the truck was a total loss and payed Montrose for its value. General Accident then sought reimbursement from Ford Motor Company (Ford or Petitioner), the manufacturer of the chassis cab truck, but Ford refused.

On 5 May 1998, General Accident, on behalf of Respondent, filed a subrogation claim against Ford in the Circuit Court for Montgomery County alleging negligence, breach of warranty, and strict liability based on a manufacturing defect. The trial court, after a bench trial, entered judgment in favor of Ford on all claims. General Accident appealed. The Court of Special Appeals affirmed the Circuit Court's judgment in favor of Ford on the express warranty, negligence, and strict liability claims, but vacated that part of the Circuit's Court's judgment with regards to claims of breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. *International Motors v. Ford,* 133 Md.App. 269, 273, 275, 754 A.2d 1115, 1117, 1118 (2000). We granted Petitioner's petition for writ of certiorari, *Ford Motor Company, Inc. v. General Accident,* 362 Md. 34, 762 A.2d 968 (2000), to consider the following questions:

1. Did the Court of Special Appeals err in holding that proof of product defect is not required to sustain a claim for breach of the implied warranty of merchantability, thereby shifting the burden of proof to the manufacturer, even though all prior reported decisions on this issue in Maryland have held that, regardless whether a claim sounds in negligence, strict liability, or implied warranty, a plaintiff must prove the existence of a defect?

2. Did the Court of Special Appeals err in holding that plaintiff made out a claim for breach of the implied warranty of fitness for a particular purpose even though the

alleged "particular purpose" of the product was the same as its ordinary purpose, the product damage was unrelated to the alleged particular purpose, there was undisputed lack of privity between the manufacturer and the plaintiff, and such a claim was never before the trial court?

## I.

On 15 March 1995, Ford sold a 1995 F-350 chassis cab truck[1] it had manufactured to Homer Skelton Ford, Inc., a Ford dealership in Olive Branch, Mississippi. The truck came with an express "bumper to bumper" warranty that provided, in pertinent part:

> Authorized Ford Motor Company dealers will repair, replace or adjust all parts on your vehicle (except tires) that are defective in factory-supplied materials or workmanship for 3 years or 36,000 miles (whichever occurs first).

*Warranty Information Booklet for 1995–Model Ford and Mercury Cars and Light Trucks* 5 (1995). The "bumper to bumper" warranty did not cover, in pertinent part, "alteration, misuse, or damage caused by accident" or consequential or incidental damages. *Id.* at 4, 11–12.

On 16 May 1995, Elzenheimer Chevrolet, located in the State of New York, purchased the truck from Homer Skelton Ford and converted it into a tow truck. To convert the chassis cab into a tow truck, Elzenheimer Chevrolet added,

---

1. A chassis cab truck, and specifically the 1995 Ford F-350 in the present case, was described as a truck with a frame and cab that contained all of the interior devices usually found in a truck, such as a heater, blower, motor, plenum, radio, steering controls, braking controls, engine, transmission, and axle. The rear of the chassis cab truck, however, only has a drive train. At trial, Ford's expert, Ronald Ehlert, explained a chassis as the following:

   > Chassis in a sort of succinct way is if you took the body off this vehicle you would have the suspension and the brakes and the steering system absent the steering column, and that would be the chassis.

   Chassis cab trucks are sold with the anticipation that they can be, and usually are, modified into a tow truck, dump truck, garbage truck, or any one of many other acceptable uses through the addition of the required equipment.

among other things, a towing bar, boom tow sling, a light illumination bar on top of the pre-existing lights along the body of the truck, a strobe light in the grill, a two-way radio mounted to the dash board, a three-switch electrical panel inside the passenger cab, and a power take-off with controls on the transmission hump. On 5 August 1995, Montrose purchased the truck, as yet unused as a tow truck, from Elzenheimer and insured it with General Accident.

On 19 August 1997, the truck, now with 27,600 miles on the odometer, caught fire while its operator, Greg Blum, a Montrose employee, was preparing to tow another vehicle. Mr. Blum had responded to a routine call to Dulles Airport in Virginia to tow a limousine, which had been struck on the driver's side door by a shuttle bus. When Mr. Blum arrived, he observed that the door to the limousine was stuck in the open position. Before the vehicle could be towed safely, the door of the limousine needed to be closed. It took approximately fifteen minutes to secure the door. While working on closing the car door, Mr. Blum kept the engine of the tow truck running. This was necessary apparently because the engine must be running in order to use the power take-off to tow a vehicle.[2] He reentered the driver's compartment of the tow truck to back the truck up to begin the actual hook-up and towing.

When Mr. Blum reentered the tow truck to begin the towing process, he noticed steam or smoke coming from under the hood of the vehicle. He checked the engine temperature gauge, but it registered normal. When Mr. Blum looked up from the gauge, he noticed flames coming from under the hood of the vehicle on the passenger side.[3] After pulling the hood release located under the driver's side of the dashboard,

---

**2.** The power take-off is a mechanical control that diverts power from the transmission of the vehicle to a hydraulic pump that operates the wrecker body. The wrecker body in turn operates the wheel lift, which lowers and raises the front or rear end of the disabled vehicle.

**3.** Mr. Blum testified that there were no flames projecting into the driver's/passenger's compartment of the truck at this time.

he exited the cab and proceeded to the rear of the truck to retrieve a fire extinguisher. When he went to the front of the truck with the extinguisher and attempted to lift the engine hood, he found the hood too hot to touch. He aimed the fire extinguisher towards the flames and completely discharged the extinguisher.

The truck was deemed a total loss. General Accident paid Montrose for its value, stipulated to be $23,880.21. General Accident, the subrogated insurer, thereafter wrote to Ford seeking reimbursement. Ford initially responded that it needed to inspect the vehicle. General Accident voluntarily made the vehicle available to Mr. Samuel, an inspector employed by Ford. After Mr. Samuel inspected the vehicle and reported, Ford denied the claim.

On 5 May 1998, General Accident, on behalf of its insured, Montrose, filed a subrogation claim against Ford in the Circuit Court for Montgomery County. General Accident thereafter filed two amended complaints, the last of which alleged claims for negligence, breach of warranty, and strict liability based on a manufacturing defect.[4]

A one-day bench trial was held on 24 June 1999. At trial, General Accident abandoned its claim of a manufacturing defect, claiming instead that a design defect in the Ford vehicle caused the fire.[5] General Accident, it is supposed,

---

4. The Second Amended Complaint states, in pertinent part:

   Plaintiff sues Defendant for negligence for failing to exercise reasonable care in manufacturing a product which caused damage to the Defendant's vehicle, for breach of warranty for selling a product which cause property damage and also for strict liability in tort under the authority of *United [States] Gypsum Company v. Mayor and City Council of Baltimore,* 336 Md. 145, 647 A.2d 405 (1992) [1994]. The Defendants placed a defective product on the market which caused property damage and which created a substantial and unreasonable risk of death and personal injury.

5. The following relevant discourse took place at trial:

   [DEFENDANT'S TRIAL ATTORNEY]: Well, strict liability claims are really two-fold. The manufacturing I think should be granted because there was no evidence.

proceeded to trial under claims of negligence, express warranty,[6] implied warranty of merchantability,[7] implied warranty of fitness for a particular purpose,[8] and strict liability.

---

> THE COURT: I do not think he is—you are not claiming a manufacturing defect?
> [PLAINTIFF'S TRIAL ATTORNEY]: No.
> [DEFENDANT'S TRIAL ATTORNEY]: Okay. The design defect claim requires proof that the car is in a defective condition and that product is unreasonably dangerous....

**6.** The Maryland Code, Commercial Law Article, defines an express warranty as follows:
> (1) Express warranties by the seller are created as follows:
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.
>
> Md.Code (1975, 1997 Repl.Vol.), § 2–313.

**7.** The Maryland Code, Commercial Law Article, defines implied warranty of merchantability in pertinent part as follows:
> (1) Unless excluded or modified (§ 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
> (2) Goods to be merchantable must be at least as such as ...
> (c) Are fit for the ordinary purposes for which such goods are used....
>
> Md.Code (1975, 1997 Repl.Vol.), § 2–314.

**8.** The Maryland Code, Commercial Law Article, states that an implied warranty of fitness for a particular purpose exists
> (1) Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

At trial, General Accident offered evidence, through its expert, Mr. Leshner, that the fire had originated in the blower plenum,[9] a box that houses the blower fan and associated electrical resistors, all of which are part of the heating/air conditioning system. Specifically, General Accident's expert opined that the design was defective in that the holes in the cowl vent—the area just in front of the windshield that permits air to travel into the engine compartment—were too large and could have admitted debris such as leaves or other combustible material. According to the expert's testimony, such combustible material could have come into contact with the electrical resistors, which, if they were hot, could have ignited the material. The expert also explained how he was able to rule out other causes of the fire by examining the parts of the truck that were burned. At the close of General Accident's case, the trial judge, on Ford's motion, granted judgment in favor of Ford on General Accident's strict liability and express warranty claims.[10]

In the course of Ford's defense, its expert, Mr. Ehlert, testified contrary to Mr. Leshner as to the cause and origin of

Md.Code (1975, 1997 Repl.Vol.), § 2–315. The second question under review in the present case asks us to consider whether the issue of implied warranty of fitness for a particular purpose was preserved properly at trial. *See infra* pp. 336–42.

9. As noted *supra* note 1, the original chassis cab truck, as manufactured by Ford and sold to Skelton Ford, contained this component. Our examination of the record does not reveal if Elzenheimer's conversion of the chassis cab included modification to this component or whether it remained as manufactured by Ford.

10. The trial judge stated:
THE COURT: . . . The Court is going to—with regard to the other issue—is going to grant the motion with regard to the strict liability claim.
The Court believes there was failure of proof in that as to the requirements of showing that there was a safe alternative or a safer alternative and the various aspects necessary to show that.
With regard to the basic negligence claim, at this point, the Court will deny it, and let's go forward with that.
I will reserve ruling on the issue of the measure of damages or the standard of damages and on the implied as well.

the initial fire. He determined that the fire could not have started in the blower plenum, based, in part, on his examination of the truck in which he found highly flammable, but unburned, materials in the blower plenum area and on his analysis of the burn patterns. Though Mr. Ehlert could not determine with reasonable certainty the specific cause of the fire, he opined that he was able to rule out that the fire originated in the blower plenum.

At the conclusion of the trial, the judge rejected General Accident's design defect theory and entered judgment for Ford on the two remaining claims—negligence and breach of the implied warranty.[11] The court concluded that the "fire originated under [the] hood area at least rather than in the cab area," but could not determine that General Accident had proven by a preponderance of evidence that there was either a design defect or negligence on the part of Ford. The trial judge stated:

> The Court finds that there has not been such a showing. The Court listened very carefully to the testimony of both experts with regard to the—to the cowl vents, the—I guess—the way they were constructed and designed in the 1980s and the problems that resulted and the redesign of them into the 1990s and by the time this particular vehicle was manufactured.
>
> And the Court is not persuade[d] that ... the cause of that fire was any debris that came through the cowl vents into resistors and that that, if it did, that that was some faulty design or negligence.
>
> * * *
>
> So in short, the Court simply does not believe the plaintiff met its burden of proof with regard to a showing that there was any negligence either in the design or in any other way

---

11. See *infra* pp. 341–42 explaining that the trial judge did not explain whether he was ruling on a specific implied warranty, i.e., the implied warranty of merchantability or the implied warranty of fitness for a particular purpose.

by Ford which was the proximate cause of the particular damage in this case.

General Accident's attorney immediately sought oral clarification, asking the trial judge whether he still was considering the implied warranty claim. The judge responded:

No, the Court finds if—in order to clarify—that there has been no showing that there was any warrantee [sic] which was—which was breached.

The Court simply finds that there was an unfortunate, devastating fire, that it originated somewhere under the hood, but the Court does not believe that it is has been persuaded what the cause of that particular fire was and whether it was something that would have been brought within an implied warranty.

So the Court does not even reach the question of whether an implied warranty would apply here. But assuming it would, the Court finds that there has been no showing that there has been any kind of a breach of an implied warranty.

The court then entered final judgment for Ford. General Accident's subsequent written revisory motion on the issues of breach of express and of implied warranty was denied.

On General Accident's appeal, the Court of Special Appeals affirmed the Circuit Court's judgment in favor of Ford on the claims of breach of express warranty, negligence, and strict liability. *International Motors,* 133 Md.App. at 275, 754 A.2d at 1118. The intermediate appellate court, however, with regard to the claims of breach of the implied warranty of merchantability, § 2–314, *supra* note 7, and the implied warranty of fitness for a particular purpose, § 2–315, *supra* note 8, vacated the trial court's judgment and remanded the case "for resolution of [the] implied warranty claims." *International Motors,* 133 Md.App. at 273, 754 A.2d at 1117.

The intermediate appellate court noted that the Circuit Court found, as a fact, that the fire originated under the hood

of the truck, not in the cab/passenger area.[12] *International Motors*, 133 Md.App. at 275, 754 A.2d at 1118. As such, the Court of Special concluded that "[o]n the basis of that not clearly erroneous factual finding, we are persuaded that the circuit court should not have entered judgments in favor of Ford on the implied warranties of fitness and merchantability claims." *International Motors*, 133 Md.App. at 275–76, 754 A.2d at 1118. The Court of Special Appeals reasoned that the trial court reached the improper conclusion that General Accident did not prove "by a preponderance of the evidence that it was either a defect or negligence by the ... defendant" as, according to the Court of Special Appeals, General Accident did not have to prove a specific manufacturing or design defect "to prevail on an implied warranty claim." *International Motors*, 133 Md.App. at 276, 754 A.2d at 1118 (internal quotation marks omitted).

The Court of Special Appeals noted that the statutory definition of the implied warranty of merchantability does not contain the words "defect" or "defective condition." *Id.* The court concluded that "[t]he words 'defect' or 'defective condition' do not appear anywhere in this section of the code, and Maryland case law does not require such proof." *Id.* The court then determined that General Accident "was also provid-

---

12. In so determining, the Court of Special Appeals stated:

Ford presented expert testimony that "the fire which resulted in the damage to the 1995 Ford truck on or about August 19th, 1997, was the result of an electrical malfunction within the heating and air-conditioning plenum at the right rear corner of the engine compartment." The circuit court rejected that testimony, finding instead that "this fire did originate under the hood area," rather than in the "cab area."

*International Motors v. Ford*, 133 Md.App. 269, 275, 754 A.2d 1115, 1118 (2000). Ford correctly notes, in its brief, that it did not present such expert testimony at trial. Rather, the language used by the Court of Special Appeals appears to have come from the written report of one of General Accident's experts. At trial, with Ford's consent, the report of a Mr. Seals, an expert employed by General Accident who was unable to testify in person, was read into evidence. After the Court of Special Appeals's opinion was filed, Ford moved for reconsideration based in part on this discrepancy. The Court of Special Appeals denied Ford's motion without comment.

ed protection under the implied warranty of fitness for a particular purpose." *Id.* Noting that the words "defect" or "defective condition" do not appear in this statutory definition either, the court reasoned that General Accident did not have to prove a defect. *Id.* In so concluding, the court reasoned:

"Ford manufactures chassis cabs with knowledge that they will be modified in some form or another. Ford was aware that Elzenheimer had, in the past, purchased Ford chassis cabs for the purpose of turning them into tow trucks. Thus, Ford impliedly warranted that the truck would be fit for usage as a tow truck.

Here, the evidence showed that Ford breached its implied warranty of fitness for a particular purpose when (1) General [Accident]'s insured was using the truck as a tow truck, and (2) the truck unexpectedly caught on fire. The circuit court was persuaded that the fire started in the engine compartment of the truck while the truck was idling. The truck was being used 'normally' at that time, and trucks do not normally catch on fire while idling."

*International Motors,* 133 Md.App. at 276–77, 754 A.2d at 1119. The court concluded that implied warranties "exist so consumers can recover in cases like this one without having to prove the particular defect that caused the problem." *International Motors,* 133 Md.App. at 277, 754 A.2d at 1119.

The court allowed as how post-sale modifications may constitute a valid defense to a warranty claim, but that the burden is on the manufacturer, Ford in the instant case, to prove such a defense. *International Motors,* 133 Md.App. at 277, 754 A.2d at 1119. Although Ford presented such evidence at trial, the court concluded that the record "does not indicate that the circuit court resolved the issue of whether the fire was caused by alterations or modifications after Ford had sold the truck. It is therefore necessary for the circuit court to determine whether the fire was caused by post-sale modifications to the truck." *Id.* The Court of Special Appeals ultimately remanded the case to the circuit court to determine "whether Ford has an alteration or modification

defense to the area where the fire originated, i.e. 'under the hood area.' " *Id.*

## II. *Implied Warranty of Merchantability*

■ The Court of Special Appeals erred in holding that proof of a specific product defect is not required to maintain a claim for breach of the implied warranty of merchantability. This Court long has held that a plaintiff asserting a breach of the implied warranty of merchantability must prove that the product was defective.

Although the Court of Special Appeals accurately noted that the words "defect" and "defective condition" do not appear expressly in § 2–314(2)(c), *supra* note 7, it erred in maintaining, without citation, that "Maryland case law does not require proof of a defect." Moreover, the language of the Maryland statutes, and their accompanying comments, governing implied warranties do not support the Court of Special Appeals's notion that implied warranties exist to relieve plaintiffs in such cases of their evidentiary burdens of production or persuasion.

For instance, in *Hacker v. Shofer,* 251 Md. 672, 676–77, 248 A.2d 351, 354 (1968), we stated:

It is undoubtedly the settled law that to recover on an express warranty the burden of proof is on the plaintiff to establish that the article sold did not at the time of the sale conform to the representations of the warranty. *This rule of law applies with equal force to an implied warranty.*

*Id.* (emphasis added) (internal quotation marks omitted) (quoting *Great Atlantic and Pacific Tea Co. v. Adams,* 213 Md. 521, 525–27, 132 A.2d 484 (1957)); *see also, e.g., Virgil v. "Kash N' Karry" Service Corp.,* 61 Md.App. 23, 32, 484 A.2d 652, 657 (1984), *cert. denied,* 302 Md. 681, 490 A.2d 719 (1985) ("It is the plaintiff's burden to establish that it is more probable than not that the defect existed at the time of sale."). The Court of Special Appeals improperly shifted the plaintiff's burden of proof onto the manufacturer to demonstrate that the event causing injury or property damage was not caused by any defect that originated with the manufacturer.

We consistently have held that a plaintiff must prove the existence of a defect at the time the product leaves the manufacturer to recover on an implied warranty claim, as well as with regard to strict liability and negligence claims.[13]  For instance, in *Giant Food, Inc. v. Washington Coca–Cola Bottling Co., Inc.*, 273 Md. 592, 608–09, 332 A.2d 1, 10 (1975), we stated:

> In short, then, to allow the jury to decide whether there was a breach of warranty, there must be some evidence beyond mere speculation which would enable the jury to rationally decide it is more probable than not that the *defect existed at the time of sale,* which in this case, would have been when the bottles were delivered to the retailer.

*Id., see, e.g., Giant Food, Inc.*, 273 Md. at 608, 332 A.2d at 10 (emphasis added) (stating that "irrespective of the theory of recovery—negligence or implied warranty—a prerequisite to recover against a manufacturer for a defective product is that the plaintiff must show the product was defective at the time it left the manufacturer's control" (internal quotation marks omitted) (quoting *Butterfield v. Pepsi–Cola Bottling Co.*, 210 Kan. 123, 499 P.2d 539, 542 (1972))); *Eaton Corp. v. Wright*, 281 Md. 80, 92 n. 3, 375 A.2d 1122, 1128 n. 3 (1977) (explaining that, in a strict liability action as well as in a breach of warranty action, the plaintiff must prove a product defect

---

**13.** One treatise explains the evidentiary requirements for proving an implied warranty of merchantability claim as including proof of a defect:

> For a product to flunk the merchantability test, it must contain an inherent defect. . . . The cases indicate that the courts find goods to be unfit for their ordinary purposes when they can identify one of three general types of defects: manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods. This tripartite test for defect is essentially the same as that required when the theory is strict tort liability under Section 402A of the *Restatement (Second) of Torts,* except that goods may violate Section 2–314 without being 'unreasonably dangerous,' as is generally required under strict tort.  In other words, a defect that leads to primary or consequential economic loss is actionable under Section 2–314, although it probably would not trigger strict tort recovery.

> Barkley Clark & Christopher Smith, The Law of Product Warranties, ¶ 5.01[2][a], at 5–9 (1984).

when delivered); *see also, e.g., Wood v. Toyota,* 134 Md.App. 512, 517–18, 760 A.2d 315, 318 (2000) ("In a products liability case, the plaintiff must prove '(1) the existence of a defect; (2) the attribution of the defect to the seller; (3) a causal relation between the defect and the injury.'" (quoting *Jensen v. American Motors Corp.,* 50 Md.App. 226, 234, 437 A.2d 242 (1981))); *Harrison v. Bill Cairns Pontiac,* 77 Md.App. 41, 50, 549 A.2d 385, 390 (1988) (explaining that to recover on an implied warranty or strict liability claim a plaintiff in a products liability case must prove "(1) the existence of a defect, (2) the attribution of the defect to the seller, and (3) a casual relation between the defect and the injury" (internal quotation marks omitted) (quoting *Virgil,* 61 Md.App. at 30, 484 A.2d 652)); Robert E. Powell & M. King Hill, Jr., *Proof of a Defect or Defectiveness,* 5 U. BALT. L.REV. 77 (1975) (stating that "[p]roduct liability cases are based upon theories of negligence, breach of warranty and strict liability, or a combination of these theories" and that "[w]hile each theory is distinct, a brief examination of each will show that they all require proof that the product was defective when it left the hands of the manufacturer, and that the defective condition was the proximate cause of the injuries or damages of which the plaintiff complains").

In a case factually similar to the one at hand, the Court of Special Appeals in *Harrison v. Bill Cairns Pontiac,* 77 Md. App. 41, 50, 549 A.2d 385, 390 (1988), *supra,* reiterated the usual need to prove the three "product litigation basics"— defect, attribution of defect to seller, and a causal relationship between the defect and the injury—regardless of whether the theory of liability is breach of implied warranty of merchantability or strict liability. (Citing *Virgil,* 61 Md.App. at 30, 484 A.2d 652).[14] On 21 September 1982, the plaintiffs purchased a

---

14. There are some circumstances, as presented in *Phipps v. General Motors Corporation,* 278 Md. 337, 345–46, 363 A.2d 955, 959 (1976), in which the product may be deemed "defective and unreasonably dangerous without the necessity of weighing and balancing the various factors involved"—cases in which the design defect may be inferred. As explained in *Phipps:*

used 1978 Mercury Zephyr, with 58,855 miles on the odometer, from the defendant, a Pontiac dealership.[15]  *Harrison,* 77 Md.App. at 43, 549 A.2d at 387.  In *Harrison,* less than a year after the plaintiffs purchased the used vehicle, "a fire ignited either within or behind the instrument panel on the dash of the vehicle."  *Harrison,* 77 Md.App. at 44, 549 A.2d at 387.  The plaintiffs sued the manufacturer on multiple theories, including negligence, implied warranty of merchantability, and strict liability.  *Harrison,* 77 Md.App. at 47, 549 A.2d at 388.  The plaintiffs' expert opined that the fire was caused by an electrical short circuit occurring behind the instrument cluster, based on his conclusion that that was the only triggering event that could have caused a fire in the area of origin.  *Harrison,* 77 Md.App. at 44, 549 A.2d at 387.  The plaintiffs' second expert also opined that the fire was a result of a defect in the electrical system in the car, though he was unable to identify specifically what the defect was.  *Harrison,* 77 Md. App. at 45–47, 549 A.2d at 387–88.

The trial court granted summary judgment to the manufacturer on all counts.  The Court of Special Appeals affirmed, determining that the evidence of an electrical short and the expert's opinion that an electrical fire would not normally result in the absence of a product defect was insufficient to permit an inference of a product defect in a five year old car with over 58,000 miles on it.  *Harrison,* 77 Md.App. at 51–53, 549 A.2d at 390–91.  The court explained that "[plaintiffs]

---

For example, the steering mechanism of a *new* automobile should not cause the car to swerve off the road . . .;  the drive shaft of a *new* automobile should not separate from the vehicle when it is driven in a normal manner . . .;  the brakes of a *new* automobile should not suddenly fail . . .;  and the accelerator of a *new* automobile should not stick without warning, causing the vehicle suddenly accelerate.

*Id.* (emphasis added).  These examples differ from the facts of the present case, and those in *Harrison,* because the vehicles in *Harrison* and here were vehicles with many miles of usage prior to the incident giving rise to the litigation.  Therefore, the "product litigation basics" are required to be proven because circumstances are not present to justify an inference of a defect.

**15.** In the present case, the vehicle under scrutiny was, at the time of the fire, two years old and its odometer registered 27,600 miles.

must present evidence sufficient for a jury inference that the vehicle was defective and that this defect existed at the time of manufacture." *Harrison,* 77 Md.App. at 50, 549 A.2d at 390. In examining such evidence, the court explained:

An inference of a defect may be drawn from the happening of an accident, where circumstantial evidence [16] tends to eliminate other causes, such as product misuse or alteration.... It is axiomatic, however, that "proof of a defect must arise above surmise, conjecture, or speculation ...; and one's right to recovery may not rest on any presumption from the happening of an accident."

*Harrison,* 77 Md.App. at 51, 549 A.2d at 390 (citation omitted) (second alteration in original) (quoting *Jensen,* 50 Md.App. at 232, 437 A.2d 242). Applying the above stated law to the evidence in the record, the Court of Special Appeals concluded that a defect could not be inferred:

[The appellants] have been unable to show that what might possibly have happened did probably happen. Reduced to its simplest form, their argument is that because a one-car accident happened without apparent cause, the manufacturer must be to blame. Such a theory is not supported by established principles of common-law negligence or strict liability or breach of warranty. It is simply wishful thinking.

*Harrison,* 77 Md.App. at 54, 549 A.2d at 392 (alteration in original) (quoting *Jensen,* 50 Md.App. at 234–35, 437 A.2d 242).

---

**16.** The Court of Special Appeals explained further that when inferring a product defect from circumstantial evidence the following factors should be considered:

(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect.

*Harrison v. Bill Cairns Pontiac,* 77 Md.App. 41, 51, 549 A.2d 385, 390 (1988) (citing *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa.Super. 129, 359 A.2d 822 (1976); Prosser, THE LAW OF TORTS, § 103, at 673–74 (4th ed.1971)).

III. *Implied Warranty of Fitness for a Particular Purpose*

A. *Preservation*

Petitioner argues that Respondent's claim relying on the implied warranty of fitness for a particular purpose should not have been considered by the Court of Special Appeals, and concomitantly should not be entertained by this Court, because a claim for breach of that warranty neither was pleaded nor presented to the trial court. Moreover, Petitioner continues, Respondent points to no extraordinary circumstances or fairness considerations warranting review.

Petitioner's non-preservation argument is flawed fundamentally. Petitioner, as appellee in the Court of Special Appeals, did not argue in its brief there that Respondent's claim for breach of the implied warranty of fitness for a particular purpose "was never before the trial court." Accordingly, the intermediate appellate court reached and decided, on the merits, in its reported opinion Respondent's implied warranties arguments.[17] We granted certiorari, at Petitioner's behest, to consider the merits of the issue. Petitioner's relevant question, framed in its successful certiorari petition (*supra,* at Page 323), questioned *inter alia* implicitly the circuit court's judgment and expressly the Court of Special Appeals's decision on the resolution of the merits of the implied warranty of fitness for a particular purpose claim. Thus, we shall decide this question on its merits.

Though our refusal to decide Petitioner's late blooming suggestion of non-preservation is based on the fact that the Court of Special Appeals was not presented with that argument and accordingly reached and decided the issue, and the fact that we accepted certiorari of the issue inclusive of a challenge on the merits, we also note that it is not entirely

---

17. Even had Petitioner presented its non-preservation argument to the Court of Special Appeals, the appellate court had some discretion to reach the merits nonetheless. *See* Md. Rule 8–131(a) (2000) (stating that an appellate court may decide an issue not raised in or decided by the trial court if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal).

clear that the issue was not properly preserved at trial. Petitioner correctly states that Respondent did not request, explicitly or specifically, relief under an implied warranty of fitness for a particular purpose theory in its initial complaint, its amended complaint, its Second Amended Complaint, or at trial. Respondent's first complaint and amended complaint simply stated that one of its vehicles was "severely damag[ed] by a fire which was caused by a manufacturing defect of Ford Company, Inc.," and that Ford was responsible for the $26,482.21 in damages due to the manufacturing defect.[18] As noted, *supra* note 4, the Second Amended Complaint states:

> Plaintiff sues Defendant for negligence for failing to exercise reasonable car in manufacturing a product which caused damage to the Defendant's vehicle, for breach of warranty for selling a product which caused property damage and also for strict liability in tort under the authority of *United [States] Gypsum Company v. Mayor and City Council of Baltimore,* 336 Md. 145, 647 A.2d 405 (1992) [1994]. The Defendants placed a defective product on the market which caused property damage and which created a substantial and unreasonable risk of death and personal injury.

Unlike the first two complaints, the Second Amended Complaint does make clear that Respondent was suing for negligence, strict liability, and breach of warranty,[19] but does not clarify which types of breach of warranty—implied warranty of merchantability, implied warranty of fitness for a particular purpose, and/or express warranty.[20] Petitioner seems to con-

---

**18.** See *supra* note 5 and accompanying text explaining that General Accident abandoned its claim of a manufacturing defect and proceeded on a design defect claim.

**19.** It appears that this is not the first time that a plaintiff has sued under a theory of implied warranty without specifying which implied warranty, and this Court has considered both implied warranties. *See, e.g., Myers v. Montgomery Ward & Co.,* 253 Md. 282, 286–87, 252 A.2d 855, 858 (1969).

**20.** This ambiguity was noted at trial by Petitioner's trial attorney: "It is not clear to me what warranty claim [Respondents] are asserting,

cede, however, that Respondent "submitted claims to the trial court consisting of strict liability, negligence, breach of an express warranty, and breach of the implied warranty of merchantability." Petitioner's Br. at 17–18.

At trial, as noted *supra,* when the trial court partially granted Petitioner's motion for judgment at the close of Respondent's case, *supra* p. 328, n. 10, the trial judge stated: "I will reserve ruling on . . . the implied as well." It appears that the trial judge was referring to the implied warranty claim or claims. After all of the evidence was presented, and the trial judge rendered his decision in favor of Petitioner, Respondent's trial attorney engaged in the following exchange with the court:

[RESPONDENT'S TRIAL ATTORNEY]: Your Honor, may I seek clarification?

THE COURT: Yes.

[RESPONDENT' TRIAL ATTORNEY]: Your Honor recalls that you had indicated that the implied warranty of merchantability you were reserving.

I do not believe that that claim requires a showing of negligence, and I just want a clarification of whether that claim is still viable. Are you still considering that claim? THE COURT: No. Okay, thank you for that. I will clarify. No, the Court finds if—in order to clarify—that there has been no showing that there was *any* warrantee [sic] which was-which was breached.

The Court simply finds that there was an unfortunate, devastating fire, that it originated somewhere under the hood, but that the Court does not believe that it is has been persuaded what the cause of that particular fire was and whether it was something that would have been within an implied warranty.

*So the Court does not even reach the question of whether an implied warranty would apply here. But assuming it*

---

whether it be breach of implied warranty, of merchantability, or express warranty."

*would, the Court finds that there has been no showing that there has been any kind of an breach of an implied warranty.* (Emphasis added).

Although Respondent's attorney inquired specifically regarding the implied warranty of merchantability, the trial court responded with a general ruling regarding "any implied warranty" claims. It appears that Respondent is correct in stating that the trial court did not refer to or discuss either implied warranty theory in its ruling, nor did it give reasons why the claims were rejected.

On 28 June 1999, the day after the bench trial and the trial judge's ruling, Respondent's attorney filed a Motion for Reconsideration, in which he discussed distinctly the implied warranties of merchantability and fitness for a particular purpose. He did so again, on 12 July 1999, in his Supplemental Motion for Reconsideration. Petitioner's attorney, on 14 July 1999, filed a Response to Plaintiff's Motion for Reconsideration, in which Petitioner seemingly acknowledged that Respondent had sued Petitioner "on several theories: breach of express warranty, breach of implied warranty, breach of the warranty of merchantability, negligence, and strict liability." Petitioner's attorney there did not assert that Respondent's argument regarding an implied warranty of fitness for a particular purpose theory was not before the trial court; instead, it appears to us that Petitioner recognized a second claim for implied warranty in stating that Respondent had sued on several claims, including "implied warranty [and] breach of the warranty of merchantability." On 2 August 1999, the trial court judge generally denied Respondent's revisory motion. From this record, it appears that the trial judge considered and decided the issues of both implied warranty theories generally.

### B. *Sufficient Evidence*

Petitioner alternatively argues that there was insufficient evidence to support a claim of implied warranty of fitness for a particular purpose. The Court of Special Appeals determined that, as to the implied warranty of fitness for a particular

purpose, § 2–315, *supra* note 8, Respondent did not have to prove a defect in order to prevail under this theory. *International Motors*, 133 Md.App. at 276, 754 A.2d at 1118. The intermediate appellate court surmised:

> Ford manufactures chassis cabs with knowledge that they will be modified in some form or another. Ford was aware that Elzenheimer had, in the past, purchased Ford chassis cabs for the purpose of turning them into tow trucks. Thus, Ford impliedly warranted that the truck would be fit for usage as a tow truck.
>
> Here, the evidence showed that Ford breached its implied warranty of fitness for a particular purpose when (1) General [Accident]'s insured was using the truck as a tow truck, and (2) the truck unexpectedly caught on fire. The circuit court was persuaded that the fire started in the engine compartment of the truck while the truck was idling. The truck was being used "normally" at that time, and trucks do not normally catch on fire while idling.

*International Motors*, 133 Md.App. at 276–77, 754 A.2d at 1119. It is our view that the Court of Special Appeals improperly analyzed what the required elements of the implied warranty of fitness for a particular purpose are.

### i. *The Elements of § 2–315*

An implied warranty of fitness for a particular purpose is conceded generally to have three affirmative elements:

(1) The seller must have reason to know the buyer's particular purpose.

(2) The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.

(3) The buyer must, in fact, rely upon the seller's skill or judgment.

James J. White & Robert S. Summers, 1 UNIFORM COMMERCIAL CODE § 9–10, at 528 (4th ed.1995); *see* Beverly Clark & Christopher Smith, THE LAW OF PRODUCT WARRANTIES, ¶ 6.01[2]

(1984); Ronald Anderson, 3A UNIFORM COMMERCIAL CODE, § 2–315:76, at 46–47 (1995).

According to the Official Comment to § 2–315, a particular purpose means:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

Md.Code (1975, 1997 Repl.Vol.), Comm. Law Art. § 2–315, Comment 2. Explained in another manner, the particular purpose "must be distinguishable from the normal use of the goods"; "[t]he purpose must be peculiar to the buyer as distinguished from the ordinary or general use to which the goods would be put by the ordinary buyer." Anderson, *supra*, § 2–315:95, at 56; *see* Clark & Smith, *supra*, ¶ 6.02, at S6–8 (Supp.1999) ("A 'particular purpose' under Section 2–315 contemplates a specific use of the good that is peculiar to the nature of the buyer's business, while an 'ordinary purpose' refers to use customarily made of the goods." (citing *Berkeley Pump Co. v. Reed–Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983))).

■ In addition to the particular purpose requirement, a party asserting a claim under § 2–315 must establish that the seller had reason to know, at the time of sale, that the purchaser had that particular use of the good in mind and that the purchaser was relying on the seller's expertise to select an appropriate product for that purpose. The need to establish specific knowledge on the part of the seller often may create a near requirement of direct dealing, if not actual privity, *see Wood Products, Inc. v. CMI Corp.*, 651 F.Supp. 641, 649 (D.Md.1986) (seeking to apply Maryland law and stating that

"[p]rivity is ... required in an action for breach of express warranty or an implied warranty of fitness for a particular purpose in which only economic loss is claimed"). It is often impossible for a seller to learn of a particular purpose of a buyer, and for a buyer to rely upon a seller to select the right product, without some direct dealing between such buyer and seller.[21] As one treatise has explained:

> The warranty of fitness theory is usually not available against a remote manufacturer, who would have no reason to know of any special use to which the buyer would put the goods, even though the dealer could be liable. In other words, the absence of vertical privity removes the elements necessary to support the warranty of fitness. On this ground, the warranty of fitness sharply contrasts with the warranty of merchantability, which involves an inherent defect in the goods that existed before they left the hands of the manufacturer.

Clark & Smith, *supra,* ¶ 6.03[1], at S6–12 (Supp.1999). Clark and Smith also noted:

> Vertical privity would almost always be a bar against a plaintiff suing a remote link in the chain of distribution for breach of the implied warranty of fitness for a particular purpose under Section 2–315. Under this Section, a cause of action requires (1) the seller's "reason to know" the buyer's special use of the goods, and (2) the buyer's reliance upon the seller's expertise. By its very nature, [the implied warranty of fitness for a particular purpose] is a warranty embracing adjoining links in the chain. Since breach does not normally involve any inherent defect in goods, but instead arises out of the unique relationship between immediate buyer and seller, suit based upon the warranty of fitness would rarely be brought against a remote defendant. If it were brought, the warranty of fitness would probably be dashed due to the absence of vertical privity or the absence of the requisite elements to support the theory. In

---

21. It is possible the seller could know through other means such as through an intermediary-a broker, for example.

short, the vertical privity defense and the warranty of fitness do not fit together in any rational way.

Clark & Smith, *supra,* ¶ 10.03, at 10–17 (1984). This sentiment is echoed by Anderson:

> The elements of knowledge of the seller of the buyer's particular need and of the buyer's reliance on the seller's skill and judgment may suggest the existence of direct dealings between the seller and the buyer. This in turn would suggest that privity of contract is present and, conversely, that the lack of privity would tend to negate the existence of knowledge on the part of the seller or reliance on the part of the buyer.

Anderson, *supra,* § 2–315:93, at 55.

■ Under the circumstances of the present case, a problem of proof of knowledge exists. Neither Elzenheimer Chevrolet, which transformed the cab chassis truck into a tow truck, nor Respondent was the direct purchaser of the original product from Petitioner. Because neither was the direct purchaser of the truck, it becomes more difficult to prove that Ford knew or had reason to know, when first selling the truck to Homer Skelton Ford, Inc., that Respondent would buy the converted vehicle from Elzenheimer and would use it as a tow truck, or that anyone in the chain of purchasers was relying on Ford to provide an appropriate product for that ultimate use.

■ Respondent responds to the privity argument by stating:

> Contrary to [Petitioner's] assertions, there is no need for a showing of privity under § 2–315. Plaintiff needs to prove that the buyer had a particular purpose known to seller. . . . Indeed § 2–318 of the UCC even extends warranty protection to some third parties.

It is correct that the plaintiff only needs to prove that the buyer had a particular purpose known to seller, and that privity itself is not a required element that must be shown independently. The problem here is that, given the intermediate chain of owners, there was no proof that Ford had

knowledge that the chassis cab in question would be purchased ultimately for use as a tow truck.

The only basis for the asserted breach of the implied warranty of fitness in this case is that Ford knew the chassis cab *could be* converted into a tow truck and the vehicle, so converted, caught fire while idling.[22] This basis is insufficient, as is the Court of Special Appeals's assertion that Petitioner knew that (a) chassis cabs "will be modified in some form or another," and (b) "that Elzenheimer had, in the past, purchased Ford chassis cabs for the purpose of turning them into tow trucks." The Court of Special Appeals incorrectly determined that the particular purpose for which the tow truck was purchased was towing and that the mere happening of the fire while the tow truck was in ordinary operation constituted a breach of the warranty of fitness for the particular purpose of towing.

As far as the record of this case reveals, the customary and ordinary uses of a chassis cab after modification are not particular uses as contemplated by § 2–315, but rather are the ordinary uses of such a product. When Petitioner sold the truck to Homer Skelton Ford, Petitioner was unaware specifically how the chassis cab would be used, though it was aware

---

**22.** At trial, Respondent read into evidence Ford's following Answers to Interrogatories:

"State whether defendant was aware that the type of truck at issue in this case has been used as a tow truck by anyone else."
The answer by [Petitioner] was, "Ford states that it sold the subject vehicle as 1995 F–350 chassis cab incomplete vehicle, and that it is foreseeable that it could be used as a tow truck...."
\* \* \*
"State whether Ford Motor Company anticipated that someone could be sitting in the driver's seat with the engine idling and the air conditioning on, and that it would have been considered acceptable use of the vehicle." And the answer by Ford was, "Yes."
... "State whether or not Ford Motor Company anticipated that the subject vehicle could be used [as] a tow truck."
It is slightly different than the other response. "Yes, Ford states that it sold the subject vehicle as an incomplete chassis cab with the anticipation that it would be or could be modified into a tow truck, dump truck, garbage truck, or any one of many other acceptable uses."

of several configurations to which such trucks had been converted historically. Petitioner's expert, Mr. Elhert, testified at trial: "[Ford] did not know when this truck was shipped what it was going to be used for. It could have been used in a variety of applications. That is why we build a chassis cab." Additionally, as noted *supra* note 22, Petitioner, in an interrogatory read at trial, stated: "Ford states that it sold the subject vehicle as an incomplete chassis cab with the anticipation that it would be or could be modified into a tow truck, dump truck, garbage truck, or any one of many other acceptable uses." Petitioner sold the chassis cab to a dealership in Mississippi, which dealer in turn sold the chassis cab (unaltered) to Elzenheimer Chevrolet, which converted it into a tow truck. There is no evidence that General Accident's insured articulated to Petitioner what particular purpose it had in mind for the chassis cab and no evidence that General Accident's insured sought to use the vehicle for other than one of its ordinary purposes.

The Court of Special Appeals reached a similar conclusion on similar reasoning in *Bond v. NIBCO*, 96 Md.App. 127, 623 A.2d 731 (1993), distinguishing between the ordinary and particular purpose of a product, i.e. faucets.[23] In *Bond*, the plaintiff, a plumber, purchased faucets, manufactured by the defendant, from a retailer/manufacturer. *Bond*, 96 Md.App. at 131, 623 A.2d at 733. The plaintiff installed the faucets in residential townhouses. The faucets subsequently leaked.

---

**23.** Similarly, the Fourth Circuit, in *Lowe v. Sporicidin International*, 47 F.3d 124, (4th Cir.1995), seeking to apply Maryland law regarding an implied warranty of fitness for a particular purpose claim, differentiated between particular and ordinary purpose. *Lowe*, 47 F.3d at 132 (citing Md.Code. (1975, 1997 Repl.Vol.), Comm. Law Art. § 2–315 (comment 2)). The Fourth Circuit concluded:

Lowe nowhere alleged that her employer purchased CSS for a "particular purpose" for which CSS was to be used, i.e., as a disinfectant, let alone that Sporicidin had "reason to know" that she was using CSS for a "particular purpose." Moreover, in her own affidavit, the only use Lowe stated that she made of CSS was to "sterilize hospital instruments"; this is precisely the "ordinary purpose" of CSS.

*Lowe*, 47 F.3d at 132–33.

The plumber sued the defendant alleging, in part, that the manufacturer was liable for breach of the implied warranty of fitness for a particular purpose. *Id.* The Court of Special Appeals, in affirming the circuit court's grant of summary judgment in favor of the manufacturer, held that the plaintiff had failed to state a claim for breach of implied warranty of fitness because

> [plaintiff] nowhere alleged that he bought the faucets for a "particular purpose" that in any way differed from the "ordinary purpose" for which these faucets might be used, let alone that [defendant], which manufactured but did not sell these faucets to him, knew of this "particular purpose." Accordingly, [plaintiff's] complaint fails to state a claim for breach of implied warranty for a particular purpose, and so judgment was properly entered for [defendant] on this claim.

*Bond,* 96 Md.App. at 137–38, 623 A.2d at 733.[24]

We conclude that there is no basis in law or fact to find any particular purpose in the present case, let alone that Petition-

---

**24.** Petitioner suggests that the Court of Special Appeals in *Thomas v. Ford Motor Credit Co.,* 48 Md.App. 617, 429 A.2d 277 (1981), incorrectly transformed the ordinary purpose of an automobile—transportation—into a particular purpose in order to bring the product under the implied warranty of fitness for a particular purpose. In *Thomas,* the Court of Special Appeals, noting that Comment 2 of § 2–315, *supra,* which differentiates between an ordinary and a particular purpose, remarked that the Comment supported Ford Motor Credit Company's contention that transportation is the ordinary purpose, not the particular purpose, of a motor vehicle. *Thomas,* 48 Md.App. at 625–26, 429 A.2d at 283. Nonetheless, the intermediate appellate court followed *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A.2d 855 (1969), a decision in which we quoted a treatise writer who espoused the idea that an ordinary purpose may also serve as a particular purpose. Relying on that particular passage in *Myers,* the court determined that a claim of breach of implied warranty of merchantability also constitutes a claim of breach of the implied warranty of fitness for a particular purpose. *Thomas,* 48 Md.App. at 626, 429 A.2d at 283.

In *Myers,* we addressed the question of when an implied warranty of fitness for a particular purpose arises. The case involved a products liability claim against the seller and manufacturer of a lawn mower. *Myers,* 253 Md. at 285, 252 A.2d at 857. Myers was cutting grass on a slope of his lawn when he slipped and fell. *Id.* His foot "found its way

under the mower," and he was severely injured by the whirling blade. *Id.* Myers sued under theories of negligence, implied warranty, and strict liability. *Id.* Defendants' demurrer was granted, and Myers appealed, arguing that implied warranties of merchantability and of fitness for a particular purpose were well plead. *Myers,* 253 Md. at 285–89, 252 A.2d at 857–59.

In reviewing Myers's claim under the implied warranties theories, we quoted a lengthy passage from Hawkland's *Transactional Guide to the Uniform Commercial Code* (1964) § 1.19020702, which articulated the views that: (1) where the circumstances of a sale imply a particular use of the goods, even where the that particular use is not expressly stated to the seller, a warranty of fitness for a particular purpose is created through a subsection of the warranty of merchantability (specifically, § 2–314(c)); and, (2) where a particular purpose has been made clear to a seller and the product fails to satisfy that specific purpose—even where the product is otherwise functional—the seller has breached both the implied warranty of fitness for a particular purpose and the implied warranty of merchantability. *Myers,* 253 Md. at 295–96, 252 A.2d at 863–64. Additionally, from the same treatise, we included the following example:

For example, one buying an automobile impliedly makes known the particular purpose for which the goods are intended—transportation. If the automobile will not run, both the warranties of fitness for the purpose and merchantability are breached, for such a defective care is not of fair quality, nor is it fit for the purpose as impliedly made known to the seller.

*Myers,* 253 Md. at 296, 252 A.2d at 864. We then concluded, citing neither case law nor § 2–315, Comment 2, as Petitioner here points out, that "there was an implied warranty that the mower was fit to cut grass safely when it was used in a normal manner, not that Myers would not be injured when he fell on the slope, and his foot slipped under the mower." *Myers,* 253 Md. at 296, 252 A.2d at 864.

Petitioner asserts that the Hawkland analysis relied upon in *Myers* has been repudiated by the majority of modern courts (*see,* e.g., *Lowe,* 47 F.3d 124; *Curry v. Sile Distributors,* 727 F.Supp. 1052, 1054 (N.D.Miss.1990) ("Mississippi follows the official comment to the Uniform Commercial Code § 2–315 and does not imply a warranty of fitness for a particular purpose when the good is purchased for the ordinary use of a good of that kind.")) and other commentators addressing the elements of the implied warranty of fitness for a particular purpose. For instance, Petitioner notes that Anderson expressly contradicts Hawkland's example:

The use of an automobile or a truck for the purpose of transporting persons or goods is not a particular purpose as that is the ordinary and normal use of such vehicles.

Anderson, *supra,* § 2–315:101, at 61. Hawkland's own treatise, it is argued, now refutes its former view of these two implied warranties. In *Hawkland U.C.C. Series,* § 2–315:1 (Art. 2) (2000) Hawkland acknowledges the differences between the implied warranties of merchantability and fitness, stating that "[t]he implied warranty of fitness for a particular purpose should not be confused with the implied

er had knowledge of such a purpose on Montrose's part. Because of this determination, we do not need to consider the remaining elements of § 2–315. The implied warranty of fitness for a particular purpose is inapplicable to the present case. Moreover, the chassis cab was being used for its ordinary purpose, rather than a particular purpose. Accordingly, we reverse the decision of the Court of Special Appeals and remand the case with direction to affirm the trial court's judgment.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

---

warranty of merchantability." *Id.* at Art. 2–672. Hawkland further explains:

According to Comment 2, "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business, whereas, the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of goods in question." Accordingly, it has been held that no warranty for particular purpose could arise out of a statement by the buyer that he "wanted to purchase a quiet, dependable and comfortable automobile which would be suitable for long distance trips on interstate highways." If the car did not meet this standard, there would be a breach of warranty of merchantability but not a breach of warranty of fitness for the particular purpose.

*Id.* at § 2–315:3, Art. 2–680–81. Because we conclude that Respondent's claim of breach of the implied warranty of fitness for a particular purpose failed for want of proof of the seller's requisite knowledge, we need not resolve here Petitioner's assertions regarding the continued efficacy of the referenced portions of *Myers.*