**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1411**

ASSURANCE COMPANY OF AMERICA; RICK DANSEY, individually,

Plaintiffs - Appellants,

v.

YORK INTERNATIONAL, INCORPORATED; DAVID W. DEWITT, t/a
Dewitt Plumbing, Heating and Air Conditioning; DAVID W.
DEWITT; GREGORY D. MORTIMER PROPERTIES, INCORPORATED,

Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Andre M. Davis, District Judge. (1:05-
cv-01301-AMD)

Argued: December 2, 2008          Decided: January 6, 2009

Before GREGORY and AGEE, Circuit Judges, and Rebecca Beach
SMITH, United States District Judge for the Eastern District of
Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Gregory wrote the
opinion, in which Judge Agee and Judge Smith joined.

**ARGUED:** William C. Parler, Jr., PARLER & WOBBER, Towson,
Maryland, for Appellants. Brian W. Casto, MILES & STOCKBRIDGE,
P.C., Baltimore, Maryland; Robert L. Hebb, SEMMES, BOWEN &
SEMMES, Baltimore, Maryland, for Appellees. **ON BRIEF:** Phillip
S. Anthony, PARLER & WOBBER, Towson, Maryland, for Appellants.
Timothy L. Mullin, Jr., MILES & STOCKBRIDGE, P.C., Baltimore,
Maryland, for Appellee York International, Incorporated; David

P. Bokow, LAW OFFICES OF GUIDO PORCARELLI, Hunt Valley, Maryland, for Appellee Gregory D. Mortimer Properties, Incorporated.

———————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Assurance Co. of America ("Assurance") and Rick Dansey (hereinafter "Plaintiffs") appeal the district court's decision granting the Defendants' motion for summary judgment on the Plaintiffs' products liability and negligence claims. For the reasons set forth below, we affirm the decision of the district court.

I.

This lawsuit arises out of a November 17, 2004, fire that damaged the vacation home of Rick Dansey. At the time of the fire, the Dansey vacation home was still under construction, but it had been substantially completed. Two furnaces serviced the home at the time of the fire--one serviced the first and second levels of the home ("the East Furnace") and the other serviced the basement ("the West Furnace"). Both furnaces were installed in a utility room in the basement of the home. The Plaintiffs allege that the fire originated in the interior of the East Furnace and was caused by a defect in the furnace. The East Furnace was manufactured by York International, Inc. ("York"), and was installed in the home by David W. Dewitt, the HVAC subcontractor for the construction project. Gregory D. Mortimer Properties, Inc. ("MPI"), was the general contractor for the construction of the home.

3

Carl Lee, MPI's project manager, first contacted Dewitt in August 2004 to install the two furnaces. Accordingly, Dewitt purchased the furnaces and converted them from natural gas sources to propane sources. Dewitt then took the furnaces to the home on August 15, 2004, but he did not make them operational at that time. In early October, Lee contacted Dewitt to complete the installation of the furnaces. On October 17, 2004, Dewitt connected the furnaces to the home's propane supply. At that time, Dewitt performed a "three test system" in which he turned each furnace's thermostat on and off three times in succession to ensure that they were running properly. It is undisputed that the furnaces were properly installed.

During the installation of the subject furnaces, Dewitt did not advise any MPI employees that they should not operate the furnaces while completing the construction of the home. Dewitt admitted that he had read the York installation manual, which states that "[t]he furnace is not to be used for temporary heating of buildings or structures under construction." (J.A. 1606.) Dewitt claimed that he had advised MPI of the York manual's warning during previous installations, but he was aware that MPI nonetheless routinely used the furnaces during the final phase of home construction. On the other hand, both Lee and Gregory Mortimer testified that Dewitt never told them that

4

they should not operate the furnaces while construction was ongoing.

After Dewitt completed the installation of the furnaces, MPI began using them as a heating source in the home. According to Mortimer, the furnaces were left in the automatic position to control the environment within the home to allow for the curing of drywall compound and to acclimatize wood finish products. Mortimer further indicated that, while he sometimes replaced filters on furnaces during construction, he could not recall whether he or any of his employees replaced the filters for these furnaces.

The fire at the Dansey vacation home was discovered by an MPI employee in the early morning hours of November 17, 2004. Deputy State Fire Marshal Jamie Rodeheaver and Deputy State Fire Marshal Ryan Chapman responded to the scene and investigated the fire. Both Rodeheaver and Chapman concluded that the fire originated in the interior of the East Furnace. In support of this conclusion, the fire marshals noticed that there was burn damage on the floor directly above the East Furnace, which caused the floor to cave in towards the utility room. In addition, the fire marshals noted a distinct difference between the condition of the interior of the East Furnace and the West Furnace. The interior of the East Furnace had extensive warping and melting, whereas the interior of the West Furnace "had very

5

limited damage," and a paper manual inside the West Furnace was undamaged by the fire. (J.A. 1498.)

In making the determination that the fire originated in the interior of the East Furnace, the fire marshals did a cursory inspection of potential ignition sources and did not undertake a detailed examination of the electrical arcing found on wiring throughout the utility room. Indeed, Chapman acknowledged that the fire marshals' primary job in investigating these types of fires is to rule out arson as the cause of the fire. Furthermore, the fire marshals did not identify any defect within the furnace that may have caused the fire nor suggest any theories about how the fire may have started, as such questions are outside of their expertise.

Following the fire marshals' investigation, the Plaintiffs engaged the services of Robson Forensic, Inc. ("Robson"), a forensic engineering company, to examine the fire scene, analyze the East Furnace, and produce expert opinions regarding the cause of the fire. Dale Cagwin, a Robson engineer, wrote an initial report (the "Cagwin report") concerning the cause of the fire; however, that report did not identify any specific defect within the East Furnace that caused the fire. Instead, the Cagwin report was limited to opinions regarding the negligence of MPI and Dewitt.

According to the Cagwin report, the failure of MPI and Dewitt to follow the York manual's instructions regarding the use of the furnace and their failure to properly maintain and inspect the furnace were breaches of the standard of care and caused the fire. Further, the Cagwin report stated that Dewitt should have either prevented MPI from operating the furnace until construction was complete or ensured that the furnace was being maintained, and his failure to take either action contributed to the fire. Daryl Ebersole, another Robson engineer, had similar opinions regarding the negligence of MPI and Dewitt.[1]

Seven months after the Cagwin report was issued, Cagwin and Ebersole were deposed. During these depositions, both experts espoused a more detailed causation theory and identified a specific defect within the furnace that they claimed was the cause of the fire.[2] In their depositions, the Robson experts first opined that the fire originated in the interior of the

---

[1] Gary Tucker, a Robson expert, had previously written a report in which he opined that the fire started when the East Furnace's induction fan motor overheated and ignited surrounding flammable materials. Daryl Ebersole initially subscribed to the theory, but the theory was eventually abandoned by the Plaintiffs and repudiated by Ebersole.

[2] Because the experts' deposition testimony was substantially identical, we will consolidate the experts' opinions and note the instances where the opinions diverge.

7

furnace, most likely in the vicinity of the induced draft fan. In support of this opinion, the experts relied on the fact that there was significant fire damage inside the furnace, with the most severe damage in the location of the induced draft fan. The experts also relied on evidence that the underside of the deck of the home was charred in the area where the combustion byproducts were released into the outside air. According to the experts, this evidence demonstrates that the furnace was running at the time of the fire and that the fire occurred as a result of elevated temperatures within the furnace.

Regarding the cause of the fire, the experts posited what has been termed the "clogged filter" theory. According to this theory, MPI's use of the furnace in the home during construction first led to the return air filter becoming clogged. This clogged filter restricted the airflow in the furnace, which caused a temperature increase in the combustion gas system. Next, the high temperature limit switch failed to shut down the furnace. Finally, the combustion gas became so hot that it ignited a polymer component in the combustion gas system, most likely the induced draft fan.

As part of the Robson experts' "clogged filter" theory of causation, they identified the high temperature limit switch as the particular defect within the furnace that caused the fire. The high temperature limit switch is a temperature-sensing

8

switch that is designed to shut down the furnace if the temperature of the combustion air and the circulating air get too high, and it should activate at a temperature range between 150 degrees and 200 degrees Fahrenheit. The high temperature limit switch is located on the top edge of the furnace.

The Robson experts gave two alternative explanations for the failure of the high temperature limit switch to shut down the East Furnace: (1) the location of the switch did not allow it to sense the increase in temperature (a design defect), or (2) the sensor component in the switch malfunctioned (a manufacturing defect). According to the experts, the high temperature limit switch was destroyed in the fire, and thus they could not determine whether the failure of the high temperature limit switch was due to a design defect or a manufacturing defect.

On May 13, 2005, Dansey and his homeowner's insurance carrier, Assurance, filed this lawsuit against York in the United States District Court for the District of Maryland. On May 25, 2006, the Plaintiffs filed an amended complaint, adding MPI and Dewitt as defendants. The Plaintiffs alleged the following causes of action against York: negligence, strict liability, defect in design, defect in manufacture, defect in warning, breach of express warranty, breach of implied warranty, and violation of the Maryland Consumer Protection Act. The

9

Plaintiffs alleged claims of negligence, breach of contract, breach of express warranty, and breach of implied warranty against both MPI and Dewitt. The Defendants moved to exclude the expert testimony of Cagwin and Ebersole and moved for summary judgment on all claims.

The district court excluded the experts' testimony based on the "clogged filter" theory because the court found the experts' opinions unreliable. Moreover, the district court found that the Plaintiffs could not alternatively rely on an "indeterminate defect" theory to prove a product defect. Accordingly, the district court granted summary judgment to the Defendants on the products liability claims. The district court also granted summary judgment in favor of MPI on the negligence claim, finding that the Plaintiffs failed to show that MPI's improper use of the furnace proximately caused the fire. In addition, the district court granted summary judgment in favor of Dewitt on the negligence claim because it found that Dewitt did not have a duty to control MPI's use of the furnace. The Plaintiffs appeal.

II.

We review the district court's grant of summary judgment de novo, applying the same legal standards as the district court. Catawba Indian Tribe of S.C. v. City of Rock Hill, 501 F.3d 368, 370-71 (4th Cir. 2007); Nguyen v. CNA Corp., 44 F.3d 234, 236

10

(4th Cir. 1995). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In deciding a motion for summary judgment, the district court must view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc).

## A.

The Plaintiffs first challenge the district court's grant of summary judgment to the Defendants on the products liability claims, contending that they put forth evidence from which a reasonable juror could find the existence of a defect in the East Furnace. In particular, the Plaintiffs claim that the testimony of the fire marshals and the Robson experts was sufficient to avail themselves of the "indeterminate defect" theory of proving a product defect.

Under Maryland law, a plaintiff in a products liability action must establish three evidentiary "basics" regardless of the theory of recovery: "1) the existence of a defect; 2) the attribution of the defect to the seller; and 3) a causal

11

relation between the defect and the injury." Jensen v. Am. Motors Corp., 437 A.2d 242, 247 (Md. Ct. Spec. App. 1981); accord Phipps v. Gen. Motors Corp., 363 A.2d 955, 958 (Md. 1976). A product defect may be shown by putting forth one or more of three different types of evidence: "(1) direct proof based on the nature of the accident in the context of the particular product involved; (2) circumstantial proof based on an inference of a defect from a weighing of several factors; and (3) direct affirmative proof through opinion testimony by an expert witness." Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 407-08 (D. Md. 2001). "Proof of a defect must arise above surmise, conjecture, or speculation; and one's right to recovery may not rest on any presumption from the happening of an accident." Jensen, 437 A.2d at 245 (internal citation omitted); accord Virgil v. "Kash N' Karry" Serv. Corp., 484 A.2d 652, 656 (Md. Ct. Spec. App. 1984). Nevertheless, the addition of any facts that provide proof of a defect beyond that of conjecture or speculation may be sufficient to withstand summary judgment. C & K Lord, Inc. v. Carter, 536 A.2d 699, 709-10 (Md. Ct. Spec. App. 1988); see Jensen, 437 A.2d at 244.

Initially, the Plaintiffs attempted to provide direct proof of a product defect through the testimony of the Robson experts. Once the district court excluded the experts' opinions based on the "clogged filter" theory, the Plaintiffs next attempted to

12

prove the existence of a product defect through circumstantial evidence. Maryland has adopted the so-called "indeterminate defect" theory, which uses circumstantial evidence to prove a product defect. See Harrison v. Bill Cairns Pontiac, Inc., 549 A.2d 385, 390 (Md. Ct. Spec. App. 1988).

Under the "indeterminate defect" theory, first articulated by the Maryland Court of Special Appeals in Harrison, "[a]n inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration." Id. The Harrison decision identified five factors that must be considered in determining whether a plaintiff can avail itself of the "indeterminate defect" theory: "(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect." Id.; see Ford Motor Co. v. Gen. Accident Ins. Co., 779 A.2d 362, 371 & n.16 (Md. 2001) (adopting the Harrison five-factor test). Although there is no precise formulation as to how to consider these factors on a motion for summary judgment, "[t]o the extent that a plaintiff's showing on one or more of these factors cuts against these conclusions, then the strength of the inference of a defect weakens and plaintiff risks the entry of summary

13

judgment for defendant." Shreve, 166 F. Supp. 2d at 408-09; see also Crickenberger v. Hyundai Motor Am., 944 A.2d 1136, 1145 (Md. 2008) (affirming the granting of summary judgment to the defendants on the "indeterminate defect" theory); Harrison, 549 A.2d at 391-92 (same).

The district court determined that the Plaintiffs could not prevail under the "indeterminate defect" theory as a matter of law, both because the Plaintiffs' allegations of product misuse precluded the application of the theory and because the Plaintiffs failed to put forth evidence establishing the majority, if any, of the Harrison factors. We find it unnecessary to decide whether the district court erred in concluding that the Plaintiffs' allegations of product misuse precluded the application of the "indeterminate defect" theory, for we agree with the district court that the Plaintiffs failed to put forth evidence from which a reasonable juror could infer the existence of a defect.

With regard to the first Harrison factor--expert testimony as to possible causes of the fire--the Plaintiffs contend that the district court did not exclude the Robson expert testimony regarding possible causes of the fire but rather excluded only their opinion that the use of the furnace during construction clogged the furnace filter and led to an increase in temperature. This contention fails. It is clear from the

14

district court's memorandum opinion that the court excluded all opinions of the Robson experts that were related in any way to the "clogged filter" theory, including opinions regarding the failure of the high temperature limit switch. According to the district court, the experts "opine (without a scintilla of evidence) that the high temperature limit switch failed to shut down the furnace because of a defect or improper placement." (J.A. 2316 (emphasis added).) The district court continued: "[P]laintiffs lack any affirmative evidence that the high temperature limit switch was defective; nor does their theory explain how or if the other temperature sensing safety devices failed. Plaintiffs' experts essentially suggest that because there was a fire, the switch must have failed." (J.A. 2321.) Indeed, the district court later noted that the Plaintiffs could not rely on any of the Robson experts' opinions because they had "put all their eggs in the 'clogged-filter' basket." (J.A. 2325.) On appeal, the Plaintiffs did not argue that the district court erred in its exclusion of the Robson experts' opinions,[3] and we will not accept the alternative argument that the district court did not mean what it said.

---

[3] The Plaintiffs point out that they did in fact give notice of appeal on the district court's exclusion of the Robson experts' opinions. However, the Plaintiffs failed to address this argument in both the Opening Brief and Reply Brief, and thus this argument has been abandoned. Cf. United States v. Al-
(Continued)

15

Without the benefit of the excluded Robson expert testimony, the Plaintiffs cannot establish the first Harrison factor. The Plaintiffs contend that the determination by the fire marshals that the fire originated inside the East Furnace qualifies as expert testimony regarding possible causes of the fire. Even taking this evidence in the light most favorable to the Plaintiffs, it is not the type of evidence that satisfies the first Harrison factor. In cases in which courts have found the first factor to have been satisfied, plaintiffs put forth expert testimony of possible causes of the fire, not merely possible origins of the fire. See, e.g., Shreve, 166 F. Supp. 2d at 410 (snow thrower continued to rotate after auger drive lever was released); Harrison, 549 A.2d at 386 (defect in automobile's electrical system). The fire marshals' opinions were limited to the origin or source of the fire, and opinions regarding causation were outside their field of expertise. In fact, the only expert testimony that the district court admitted regarding causation was that proffered by the Defendants, which refuted the contention that the fire was caused by a defect in

Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned."); accord Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

16

the East Furnace.  The Plaintiffs are thus left with no expert testimony identifying any possible causes of the fire.

Turning to the second Harrison factor--the occurrence of the accident a short time after the sale--there are several dates of importance.  First, the subject furnace was shipped from York to its distributor on March 17, 2004, eight months before the fire.  The furnace was sold to Dewitt on August 12, 2004, a little more than three months before the fire.  After Dewitt purchased the furnace, he converted the furnace from a natural gas to a propane furnace.  The furnace was installed in the basement of the Dansey vacation home on August 15, 2004, approximately three months before the fire, and it was connected on October 17, 2004, one month before the fire.

Although there are no "hard-and-fast" rules regarding what length of time is sufficient to satisfy this factor, the Harrison case suggested that in most of the cases where courts have found the factor to be satisfied, the accidents occurred within two to three months of the time that the products left the control of the manufacturer.  549 A.2d at 391. Nevertheless, the Harrison court cited a case in which a court found the factor to be satisfied even though the product was purchased approximately eight and one-half months before the accident, see id., and thus it is conceivable that the eight

17

months between the time the furnace left York's control to the time of the fire would satisfy the second Harrison factor.

With regard to the third Harrison factor--evidence of the same types of accidents in similar products--the Plaintiffs acknowledge that they have no evidence of prior similar accidents involving this York furnace model. The Plaintiffs contend that this factor does not weigh against the application of the "indeterminate defect" theory because a manufacturer should not have a "free pass from liability for its first defective product." (Appellant's Br. 40). However, the Harrison decision included this factor among those to be considered and did not suggest that any one factor was more or less important than another. Therefore, the lack of similar accidents involving this York furnace model cuts against the application of the "indeterminate defect" theory.

The fourth Harrison factor--the elimination of other causes of the fire--also has not been sufficiently established by the Plaintiffs. The Plaintiffs attempt to rely on the investigations of the fire marshals and Ebersole to satisfy this factor. However, the evidence shows that the fire marshals did little more than a cursory examination of other possible causes of the fire, as their main investigatory function was to rule out arson as a cause. Moreover, the fire marshals did not perform a detailed examination of any electrical appliances or

18

the wiring in the utility room.  Ebersole, for his part, did not undertake an appropriate investigation to rule out other potential causes of the fire.[4]  Although Ebersole tested other mechanisms within the furnace to determine whether any of those internal mechanisms may have caused the fire, his testing assumed the very premise that the fourth <u>Harrison</u> factor was designed to validate:  that there were no other potential causes of the fire besides a defect in the furnace.  In essence, Ebersole assumed the outcome of his investigation--a defective furnace--without testing and excluding alternate theories of causation.

Turning to the final factor--the type of accident that does not happen without a defect--the parties disagree about how this factor should be interpreted.  According to the Plaintiffs, the appropriate inquiry is whether a fire could occur in the interior of a furnace without a defect, whereas the Defendants argue that the appropriate inquiry is whether a fire could occur in a utility room without a defect in the furnace.

We do not need to decide which of these formulations is correct, because the Plaintiffs have failed to satisfy this

---

[4]  Because Ebersole's testimony in this regard does not appear to be based on the "clogged filter" theory, we will assume that this testimony was not among the evidence excluded by the district court.

factor even under their formulation of the inquiry. First, there was electrical wiring throughout the utility room and running through the furnace, and it is quite possible that a fire could originate in the furnace even though the electrical wiring was the cause. Moreover, the furnace itself had been converted from a natural gas furnace to a propane furnace, and the fire could have resulted from a faulty conversion. Finally, the furnace was improperly used by MPI for at least a month prior to the fire, and this improper use may have been the cause of the fire. For all of these reasons, the fire could have originated inside the furnace absent a defect.

Examining all of the Harrison factors, only one of the factors--whether the accident occurred a short time after the sale--has been established by the Plaintiffs. Given the Plaintiffs' failure to provide expert testimony as to the possible causes of the fire, their failure to eliminate other possible causes of the fire, and the lack of evidence of similar accidents involving this York furnace model, a reasonable juror could not infer that the fire was caused by a defect in the York furnace. Therefore, the district court did not err in granting summary judgment on the products liability claims.

B.

The Plaintiffs next challenge the district court's grant of summary judgment in favor of MPI on the negligence claim, which

was based on its determination that the Plaintiffs had put forth no evidence from which a reasonable juror could conclude that MPI's improper use of the furnace was a proximate cause of the fire. In response, MPI contends that the Plaintiffs have not provided evidence that MPI breached the standard of care or that its actions caused the fire, and thus the decision of the district court should be affirmed on either ground.

In order to prevail on a negligence claim, the plaintiff must show the following: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." Rosenblatt v. Exxon Co., U.S.A., 642 A.2d 180, 188 (Md. 1994); accord Valentine v. On Target, Inc., 727 A.2d 947, 949 (Md. 1999). In order to prove that a professional, such as a homebuilder, breached the standard of care, the plaintiff must put forth evidence of the standard of care that the professional should have followed as well as evidence that the professional failed to exercise the requisite care. Cf. Crockett v. Crothers, 285 A.2d 612, 613-14 (Md. 1972) (describing the proof required for a plaintiff to prevail on a negligence claim against an engineer).

Here, the Robson experts testified that the standard of care for homebuilders required MPI to follow all of the manufacturer's instructions regarding the use of products installed in the home. Further, the Robson experts testified that MPI employees breached this standard of care when they began using the furnace in the Dansey vacation home contrary to the instructions in the York manual. Assuming that the district court did not exclude this testimony, a reasonable juror could have concluded from this evidence that MPI breached the standard of care.

Even if MPI breached the standard of care, after the district court excluded the expert testimony that was based on the "clogged filter" theory, the Plaintiffs had no evidence that MPI's use of the furnace during construction proximately caused the fire, except for the bare assertions of the Robson experts. The Plaintiffs' theory of causation was inextricably linked to the "clogged filter" theory, and the only evidence the district court admitted regarding the plausibility of the "clogged filter" theory was that of a York expert who testified that it was impossible for the fire to have started due to a clogged filter.

Even though the issue of proximate causation is generally left to a jury, if the evidence can lead to no other conclusion, then causation can be decided as a matter of law. See May v.

22

Giant Food, Inc., 712 A.2d 166, 175 (Md. Ct. Spec. App. 1998) (citing Baltimore Gas & Elec. Co. v. Lane, 656 A.2d 307, 316 (Md. 1995)). Here, the Plaintiffs put forth no evidence connecting the actions of MPI with the fire in the Dansey vacation home. Accordingly, the district court was correct in granting summary judgment to MPI on the negligence claim.

C.

Finally, the Plaintiffs contend that the district court erred in granting summary judgment to Dewitt on the negligence claim. According to the Plaintiffs, Dewitt was negligent when he made the furnace system operational knowing that MPI had a practice of using furnaces for temporary heat prior to the completion of its construction projects. Although the Plaintiffs do not explicitly state as much, a necessary component of their negligence claim is that Dewitt had a duty to prevent MPI from operating the furnace system while construction was ongoing. On the other hand, Dewitt argues that he owed no such duty under Maryland law, and thus the granting of summary judgment was proper.

To maintain a negligence claim against Dewitt, the Plaintiffs are required to show that Dewitt owed Dansey a legally cognizable duty. See Dehn v. Edgecombe, 865 A.2d 603, 611 (Md. 2005); Valentine, 727 A.2d at 949. A duty, in negligence cases, is defined as "an obligation, to which the law

23

will give recognition and effect, to conform to a particular standard of conduct toward another." Ashburn v. Anne Arundel County, 510 A.2d 1078, 1083 (Md. 1986) (quoting Prosser & Keeton on the Law of Torts § 53 (5th ed. 1984)) (internal quotations omitted). The existence of a legally cognizable duty is a question of law to be decided by the court. Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship, 826 A.2d 443, 451 (Md. 2003); Muthukumarana v. Montgomery County, 805 A.2d 372, 387 (Md. 2002).

The Plaintiffs failed to identify any duty owed by Dewitt to prevent MPI from operating the furnace during construction. Maryland has adopted the Restatement (Second) of Torts, which "articulates the general rule that 'there is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.'" Lamb v. Hopkins, 492 A.2d 1297, 1300 (Md. 1985) (quoting Restatement (Second) of Torts § 315 (1965); see also Remsburg v. Montgomery, 831 A.2d 18, 31 (Md. 2003) (discussing Maryland's adoption of the Restatement (Second) of Torts regarding this issue). The Restatement (Second) of Torts lists the types of

24

special relations to which such a duty attaches, see §§ 314A, 316-320,[5] and notably this list does not include two parties in a contractual relationship such as that between Dewitt and MPI. Further, the Plaintiffs have not identified any Maryland decisions supporting their contention that an installer of a product has a duty to prevent an experienced homebuilder from improperly using the installed product.

Since the Plaintiffs cannot show that Dewitt owed a duty to control MPI's use of the furnace, the district court did not err in granting summary judgment in favor of Dewitt on the negligence claim.

III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[5] The types of special relations include: common carrier and passenger (§ 314A(1)), innkeeper and guest (§ 314A(2)), possessor of land open to the public and person who enters the land (§ 314A(3)), parent and child (§ 316), master and servant (§ 317), landlord and tenant (§ 318), caretaker and person known to have dangerous propensities (§ 319), and custodian and ward (§ 320).